I'd like to reserve five minutes for rebuttal. May it please the Court, I am Jake Bislinsk on behalf of plaintiffs and the putative class. The class period begins on February 19th, 2019, when Musk claimed that Tesla would release feature-complete full self-driving this year, adding, I'm certain of that, that is not a question mark. He emphasized this point, claiming again, so there's feature-complete for full self-driving this year with certainty, this is something we control and I manage autopilot engineering directly every week in detail, so I'm certain of this. Shortly thereafter, he claimed, next year, for sure, we'll have 1 million robo-taxis on the road, and then concluded, autopilot is about twice as safe as a normal driver on average. Almost two years later, the California DMV reached out to Tesla. The California DMV oversaw autonomous vehicle permitting, and any company trying to test autonomous vehicles in California needed a permit. So the DMV reached out because Tesla had recently released or announced the release of a beta program for city streets autonomous driving under its full self-driving package. The DMV asked Tesla about the situation, and Tesla's associate GC wrote to the DMV explaining that city streets continues to firmly root the vehicle in SAE level two capability and does not make it autonomous. And the DMV, because it regulates both testing for autonomous vehicles and the vehicles themselves, followed up asking, okay, but what's your plans? And Tesla responded, they expect the functionality to remain largely unchanged and did not expect future enhancements to shift the driving test to the system. This was perplexing. So the DMV got on a call with several senior Tesla employees, asking them to explain Elon's messaging about level five capability by the end of the year. CJ Moore, Tesla's director of autopilot software, was direct. Musk's messaging does not match engineering reality, he said. CJ elaborated that Tesla is at level two and that performance would need to improve to roughly one to two million miles per driver intervention before higher levels of autonomy could be considered. Council, can you explain to me why those statements wouldn't fall under the safe harbor? Why aren't they forward-looking? Why in your estimation that would not be appropriate? Yes, your honor. Thank you. We have sort of three different reasons for why these statements are not protected by the safe harbor. The first that I'd like to talk about is that the safe harbor cannot be invoked by Tesla and Elon Musk in this case because of the statutory exclusion that we discussed in our briefing. That exclusion says that a company that has been enjoined from violating the anti-fraud provisions of the securities laws in the three years before the full statement cannot invoke the safe harbor protections. We briefed that at the district court and the district court focused on the idea that an anti-fraud provision is a provision that is a essentially a cause of action with a scienter element and Tesla had been enjoined from violating provision internal controls provisions of the Sarbanes-Oxley Act. What we argued at the district court and on appeal is that that's a misinterpretation of the PSLRA's usage of the term anti-fraud provision. If you look to the legislative history Sarbanes-Oxley was passed in the wake of the WorldCom and Enron scandals to prevent and deter fraud and it exists as a way of making fraud more difficult. I think the best way to think about this is if I were to ask you the question is the polio vaccine an anti-polio intervention? The answer to that question is obviously yes even though it's not administered once somebody has polio. It's a prophylactic that is anti-polio in the exact same way SOX is a prophylactic that is anti-fraud. That's why it was passed that's all that it's there for and so it's very clear that that provision is an anti-fraud provision therefore Tesla cannot invoke the PSLRA safe harbor and therefore the safe harbor does not protect any of the statements. That's sort of the first argument. We have other arguments about why the around that issue as well that's in the briefing but I think that's the core of that that first argument. So the way this was kind of litigated below was kind of the safety statements the culpability statements the timing statements I don't know if that's your architecture or somebody else's but I guess first of all do you agree with that kind of breakdown and if so are you focused on any one piece of this how do you see that? Yeah and I will address more of the PSLRA point in a moment but the we're fine with that categorization I think those are sort of natural distinct groupings of the statements but I would want to and we're appealing all the dismissal of all three but I would like to explain the the theory of the deception for the timeline statements and the capability statements is fundamentally the same that Tesla was making statements misrepresenting the state of the technology at that time by by telling investors either we have fully autonomous vehicles in-house we just haven't released it publicly yet or by saying we're on the brink of releasing it it's so far advanced we can say with certainty that it's going to be released in the near term so both of those two statements are similar but different in the distinct way that one is giving a pretty forward-looking aspect to it but is alleged to be false not because of its forward-looking prediction but because of what it was saying about the present. On the time on the timeline issues though how do you deal with is it and I might be mispronouncing it but what else what else here the comments seem to be based on predictions and expectations which there were cautionary notices here why why why why isn't it could you explain how that fits into your argument? Yeah the first reason that WOCOS doesn't apply here is that argument that I just made which is that the PSLRA Safe Harbor simply does not apply to this case because the statutory exclusion is in place. The other reason that we would argue WOCOS is inapplicable here and I do want to say not all of the statements are even claimed to be forward-looking by defendants but some of some of them are claimed by defendants to be. For the ones that are I think the heart of WOCOS is and it's it's an interesting case the heart of it is saying forward-looking statements like we are on track are inactionable even if it seems very clear that that's untrue in light of the true conditions within the company and even if it sort of is based on premises that don't make sense. Here the distinction is we're not interested in whether or not they made the self-driving prediction on time. We're not interested in whether or not they actually were going to do it in a year or a year in three months or a year in six months. The fundamental fraud here is that by making those kind of statements they were conveying to the market a present tense assertion that this technology was advanced enough that it was reasonable to make that sort of prediction. Looking back to what I was talking about with the DMV which I just want to clarify one point that relates to that. When the DMV asked them you know what were your plans and they said it doesn't match engineering reality. CJ went on to explain this point that it would require you know there them to improve to 1 to 2 million miles per driver intervention. At the time that was over 60,000 times better than Tesla's current rate of performance and so what he explained was essentially there's it's not on the table in the term to be even thinking about that kind of higher level of autonomy. This technology remains firmly grounded in level 2. So this isn't a matter of do they meet the deadline you know within the time frame they've given or sometime shortly after. It's are they giving a fundamentally misleading impression about the current state of affairs by their statements that happen to talk about a timeline. So that's one way that we're distinct from WOCOS. The third way that we're distinct from WOCOS is really within the PSLRA safe harbor prongs. Many of the statements in this case were tweets or statements given during podcasts or statements given during events in which there was no forward-looking statements or sorry no cautionary language whatsoever. We also allege in great detail that this was the sort of information the true information here was the sort of information that Elon Musk would have had personal knowledge of. He held himself out as having incredible knowledge of the self-driving technology. He said he spends about 80% of his time engineering and he said that the difference between Tesla being worth a whole lot and basically zero was succeeding at this self-driving technology. We have confidential witnesses who talk about the amount of updating that he was received that he received throughout the class period that he would have regularly made regular meetings with the autonomous driving team usually I think on Tuesdays he said or Mondays he said that you know these are allegations with great specificity that he's getting updated by this team about the regressions. It's the core of the and he is a person who holds himself out as not a sort of financial manager of the company but the head engineer of the company. So the idea that they would have to improve by 60,000 times to be able to even think about moving up to higher levels of autonomy and at the same time that he wouldn't know that that's the general condition of the business is preposterous and the sort of allegation that courts say you make reasonable inferences when thinking about a party's knowledge or when thinking about their scienter. So I think the sort of move to scienter a little bit there but the point that I'm making is in the third we have three arguments for why the safe harbor does not apply. The first is the statutory exclusion that simply takes it off the table. The second is that we're dealing with statements that some of which talk about predictions but are alleged to be false and misleading because of what they were conveying about the present and not merely in some incidental way but the core allegation is that they were misrepresenting the present condition. And the third argument is that the statement simply followed at the safe harbor because they weren't accompanied by meaningful cautionary language and because Elon Musk did have actual knowledge of the truth. And I want to make one more point on the safe harbor which is that the safe harbor also doesn't apply to these statements because they are present tense assertions or at least many of them are because they were stated as guarantees. So WOCO has dealt with statements that said things like we're on track. That's a meaningful statement. I don't think it's puffery but it's certainly not a guarantee. When you make an assertion in the form of a guarantee, I am certain of that. That's not a question mark. I control this. I know it for sure. The sort of language that Elon Musk was using during the class period, that's not a statement that's prognosticating about the future. It's an assertion that at the time that statement is made, he has certainty of that fact based on current conditions. I would argue that that's a distinct fact pattern from the one that was addressed in WOCO and suggests that you should look at this differently than it was looked at in that case. So I think I answered the question about the forward looking statements and I think I answered the question about the different categories of statements. I do sort of want to talk about the safety statements a little bit. The safety statements defendants do not claim are forward looking by and large. There's a couple where there's a clearly distinctly mixed, the same paragraph has a timeline statement in it and a safety statement. But they don't argue that the safety statements themselves are forward looking. And those statements are plainly false because they claim that Tesla cars could self-drive safer than humans. I think that that is very clearly misleading in light of the real conditions within the company. The cars could not self-drive safer than humans because the technology, in large part because the technology required a human to take the wheel and drive every 16 miles or so. If a person's walking around saying, I'm safer than the average driver, but in reality they would crash if a passenger didn't grab the wheel every 16 miles, it would be a ludicrous assertion. So the degree of interventions I think speaks very strongly to the fact that the safety statements were misleading. The other facts that speak to the safety statements being misleading is that Tesla had huge amounts of knowledge about the poor safety conditions of the product. We talk about the Tesla files leaked that revealed thousands and thousands of systematic problems with the technology such as unwanted braking and unwanted acceleration that it tracked and saw as a risk to customers. We have the quote from a former senior advisor to NHTSA saying that the Tesla self-driving data set was involved in far more serious and far more frequent accidents than an ordinary driver set. That quote's not exactly, it's paraphrased. And we have the Don project showing that there are these programmatic ways in which Tesla fails to perform like a safe human driver would. So for example, if a Tesla approached during the class period, if it approached a school bus with the sign out, it would just ignore the sign and drive past it. Now, humans make mistakes when driving. A human could make that mistake. But you can't go around saying that your technology drives safer than a human when programmatically it simply fails to follow basic driving rules. That by its design, it just hasn't learned that that's a rule it needs to follow. So I think you combine all of those things, the intervention data, the record, their own knowledge of all of these safety deficiencies, the programmatic failures of the technology, and you have a very clear picture that these things could not drive safer than humans during the class period. The last point that I think really brings it all together is Elon Musk's statement after the class period saying, I think in the next year we'll be as good as humans. Well, if he's saying that after the class period, it's very clear that they weren't better than humans during the class period. Years earlier, before the end of the class period in 2019, he's claiming autopilot safer than humans. After the class period, he's saying maybe in the next year or so, it'll be better than humans. I think it's very clear that these statements were put out there to create the perception that Tesla was on the brink of launching this robo-taxi business. And that they were going to roll out all these self-driving vehicles that were going to be able to make Tesla all of this money. They're going to be able to sell this full self-driving package and generate revenue through this robo-taxi business. And to sell that business, he needed it to represent to the market that the cars could self-drive safely. And so he made statements, like the tweet that he makes, saying, active autopilot, car is driving itself, cuts crashes in half. Defendants have tried to argue that these statements are merely asserting that when properly supervised, autopilot makes cars drive safer than otherwise. That's a factual inference that should not be credited at the pleading stage. It's not the most natural reading of these statements. And it's totally contrary to the actual text of what Elon Musk said. He said, car is driving itself. He doesn't say, when properly supervised, we believe our technology can make the car a little bit safer. He's clearly trying to represent this as the next step in the car being able to move toward this robo-taxi, fully autonomous, driver-free world. And to sell that, he's claiming that they could drive safer than humans. If there's no other questions, I'd like to reserve the rest of the time. Yeah, we'll put two minutes on the clock when you come back. Thank you. May it please the Court, Elodie Thompson, Quinn Emanuel, Irk Hardin-Sullivan, on behalf of Appellees Tesla and Elon Musk. I want to start with something that I heard my friend on the other side say, which is that the theory of deception for timeline and capability statements is the same. However, the district court correctly found that, this is on page 24 of the excerpts of record, that the reason plaintiffs offer as to why the statements are false and misleading bear no connection to the substance of the capability statements and do not allege that the software was not capable of no intervention drives. What we have here and what we see in the theory that plaintiffs have put forth is that they're taking very specific statements and making generalities. They're saying that Mr. Musk said that Tesla already had achieved level four or five autonomous driving when there is nothing in the record that indicates that Mr. Musk did say that. That does get me to the timeline statements and to the safe harbor, which I'll go ahead and address. The timeline statements are protected for the safe harbor because they are forward-looking statements. They speak even as my friend on the other side said, of what would happen this year or what would happen next year. That's a clear indication that they're forward-looking such that they would be subject to the safe harbor. Contrary to what my friend said, however, there is no exclusion from the safe harbor that would apply here to Tesla. Now, there's no dispute that any exclusion would not apply to Mr. Musk because he is not an issuer. So it doesn't apply to the case as a whole, but as to Tesla, the 11th Circuit specifically has considered this question of whether provisions like the one we're talking about here, 13A, which is a disclosure controls provision, would qualify as an anti-fraud provision. In that case, this is the Carvelli versus Aquin financial case from 2019. The 11th Circuit, citing a 9th Circuit case actually from 1985, the Goldfield Deep Mines case, said that the rule at issue there, Rule 12b-20, is not one that qualifies among the anti-fraud provisions, in part because there is no scienter requirement. There is no requirement of any intentional wrongdoing. And that is exactly what the district court held here. That's consistent with what the Southern District of New York has held with regard to anti-fraud versus other provisions, that there is a difference between anti-fraud provisions and reporting provisions. That's the SEC versus McNulty case from 1996. So there is no statutory exclusion that would apply to Tesla as an issuer based on the is applicable in this action. And for those forward-looking statements, which are called timeline statements, right, and I think we agree on the characterization, timeline statements are talking about predictions going forward. So we have the capability statements for which falsity is not alleged. I believe that's what plaintiffs are talking about when they say, oh, it misrepresents a present fact, but the district court already found otherwise. There's no falsity alleged. And the timeline statements that are forward-looking. As to the safety statements, those statements, again, depend upon the exact language at issue. And the exact statement that plaintiffs' counsel read referred to autopilot. Autopilot is cruise control. It's a lane assist. It is not something that is a product that Tesla indicated could be used without a driver at the wheel. In fact, Tesla repeatedly, on its website, in its disclosures, indicated that these technological assistive devices were to be used with a driver. And Mr. Musk himself, in the capability statements, talks about how many times he can have a non-intervention drive. Tesla published statistics on the number of times interventions were needed for their drivers. So it's simply not the case that Mr. Musk ever said this is a technology that you use without a driver there, which means that the safety statements were not false either, because they're referring to this specific technology that Tesla had. But of course, there's another reason why this court should affirm the dismissal here, and that's because plaintiffs failed to plead scienter. Now, the district court correctly dismissed the Section 10b claim for failure to plead scienter, and that's because the complaint doesn't reflect any particularity of any kind about what specifically defendants learned or when they learned it. And on that, you don't have to take my word for it. Plaintiffs themselves, in the chart submitted to the district court, identified the same generic allegations, literally copying and pasting for every single statement alleged to be 112 through 150. For every statement, all 29 alleged in the district court, most of which are not at issue here in appeal, all 29, it is an exact copy-paste on the column for scienter. And that just shows these aren't generalized allegations. They're not particularized, which, of course, is what is required. Can you address the DMV documents and statements? Yes, Your Honor. First, the DMV documents and statements are from March of 2021. There's a letter and there is a memo. And I think it's notable that the statement that plaintiffs rely upon, you know, consistent with engineering reality, is in reference to a tweet from that time period. That tweet is nowhere in the complaint. In our brief, we have indicated when in 2021 the DMV memo and letter were published. And that shows that it was a March 9, 2021 tweet. So that, I think, takes care of the engineering reality point. But the other thing that the DMV statements say is that it's consistent with what Mr. Musk was representing. It indicates that it's an extrapolation based on improvements between each beta-to-beta iteration. That is what these timeline predictions of when more advanced technology will be achieved are based upon. So those DMV statements also don't support any inference of scienter, particularly when that is actually consistent with what Mr. Musk was telling the market about how he was looking at self-driving improvements, that it was based upon improvement from iteration to iteration. The other thing that plaintiffs try and rely upon for scienter are these motive allegations as to Mr. Musk. But the complaint, this is paragraph 684 at paragraph 442 of the of motive because it directly links, actually in great detail, Mr. Musk's sale of the Tesla stock to his purchase, the funding of the purchase of Twitter. In addition, while there are, the plaintiffs plead in this chart of these copy-pasted scienter allegations that Mr. Musk had access to information or the core operations theory, what is missing there and what this court can only look at that chart to confirm is missing is any specific information as to what Mr. Musk or Tesla learned at the time that contradicted the representations that were made. And that's, the Ninth Circuit case law requires specific information. That's in the Metzler case, that's in the pathogenesis case. It specifically says there must be something within that information that people had access to or that was part of the core operations that contradicted the statements that were made. That is entirely missing here, again, as the chart I pointed out confirms. So there are multiple reasons here for affirming dismissal of the district court's judgment, affirming dismissal of the complaint in this instance. And unless there are any further questions, we ask that the court affirm. Okay, thank you very much. Thank you. I want to start by addressing the statements they made about the capability statements. The capability statements were about full self-driving. He said, for example, I'm very confident about full self-driving functionality being complete by the end of the year. That's a timeline statement. And then he said, it's because I'm literally driving it. So that's an example of one of the capability statements. And it's clearly about full self-driving. I want to address the motive point very briefly as well. They're completely right. We talk about the Twitter acquisition. It's not something we're hiding from. We put it into the complaint. And the theory there is that Musk knew that he was going to need to liquidate a very large amount of Tesla stock to fund this acquisition. And therefore, was motivated by, among other things, the desire to keep a high share price when making those sales. That doesn't undercut the motive allegation. The key point about his stock sales is that Elon Musk made more money selling Tesla stock during the class period than the GDP of Vermont. He sold $40 billion or so of Tesla stock and had an enormous incentive to do so at high prices. We're not standing solely on a motive allegation. We're saying that supplements the total picture, which is that this is a person who held themselves out as working on this issue extensively. He said he was looking at the data every week. He was motivated to make these misstatements. He said he spent 80% of his time in engineering. He said this was the core of the company. And the ways we're saying the technology was deficient wasn't some accounting fraud where an accountant moved some number in a spreadsheet. It was the core state of the business at the time. I also want to address the DMV point that they made. If you read that conversation in context, I would really implore you to read through those paragraphs in the complaint. The statement that they're referencing about extrapolating from current progress is very clearly a throwaway explanation by CJ in the context of his much more firm statement about what the engineering realities were within the company. He was clearly in a conversation with the DMV and they were prodding him to explain Elon's competency. He's like, I can't really explain. I can't promise we're not going to get there, but it's not the engineering reality. The final point I'd like to address, if I may, I know I'm running out of time, is the safe harbor exclusion point. There's just a couple of key points there I want to hit. The first is that this court has very clearly held in SEC via Dana Research that Section 17 is an anti-fraud provision. It expressly referred to it as an anti-fraud provision. That's not an out-of-circuit opinion. That's this court. And Section 17 has no requirement. It is a statute that allows for negligence. This court has understood that the word anti-fraud provision is interpreted more broadly than cause of action that has a scienter element, as defendants have claimed. And the last point I want to make about the safe harbor and the exclusion is that if you look at the history of what this exclusion is trying to do, I think it speaks volumes for why our interpretation is correct. When the PSLA was passed, they put in place this safe harbor with an eye toward encouraging companies to be able to give guidance with some breathing room. But that was controversial. Like, the PSLA was controversial. It was vetoed by Bill Clinton. And there was a lot of compromises within it. And one of the compromises that was in it was that they put in place certain limitations to say if a company poses a greater risk when making forward-looking statements, maybe we don't want to give them this safe harbor. And one of those exclusions that they put in was in the context of an IPO or going private transaction. Another one that they put in was a sort of penalty box saying, look, if the company has been dinged for violating, and they originally in the statute said the securities laws, you can't rely on the safe harbor for three years. That got worked out. And this is in the briefing. That got worked out in the drafting and got changed to the antifraud provisions. But there is no reason to interpret that use of the phrase antifraud provisions to have some extremely narrow meaning in this context. The SOX provisions were passed to combat and prevent fraud. They're not just requirements to make public disclosures. They're requirements to ensure that when public disclosures are made, they're being made in a way that's not fraudulent. That's why those provisions were passed. And so it's very clear to us that those are antifraud provisions, like, by a textual interpretation, but they also clearly are antifraud provisions based on what Congress was trying to do when building in this PSLRA exclusion. Thank you. Thank you. Thank both counsel for the briefing and argument. This case is submitted.
judges: THOMAS, BRESS, MENDOZA